**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| INFINITY COMPUTER PRODUCTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TOSHIBA AMERICA BUSINESS SOLUTIONS, INC.,<br><br>Defendant. | CIVIL ACTION<br><br>NO. 2:12-cv-06796-NIQA<br>(Lead Case) |

## DEFENDANTS' REPLY CLAIM CONSTRUCTION BRIEF

Defendants Toshiba America Business Solutions, Inc., Samsung Electronics America, Inc., Konica Minolta Business Solutions, U.S.A., Inc., Xerox Corporation, HP Inc.,[1] Ricoh USA, Inc.,[2] and Dell Inc. (collectively, "Defendants") in these consolidated actions, by and through their undersigned counsel, hereby submit their Reply Claim Construction Brief pursuant to the Court's August 16, 2018 Amended Scheduling Order.

---

[1] The name of the Defendant in Action No. 2:12-cv-06805 was changed from Hewlett-Packard Company to HP Inc. effective October 31, 2015.

[2] The name of the Defendant in Action No. 2:12-cv-06807 was changed from Ricoh Americas Corporation to Ricoh USA, Inc. effective August 13, 2018.

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ...................................................................................................... 3

    A.    The "Facsimile Machine" Terms ............................................................ 3

    B.    "Passive Link" ....................................................................................... 9

        1.    "Passive Link" Is Indefinite ........................................................ 9

        2.    If Not Indefinite, the Court Should Construe "Passive Link" as Defined by Infinity in the Prosecution ...................................... 16

    C.    The "Generic Send/Receive Driver Communications Software" Terms ............ 18

        1.    The "Generic Send/Receive Driver Communications Software" Terms are Indefinite ............................................................ 20

        2.    Should the Court Decide to Construe the "Generic Send/Receive Driver Communications Software" Terms, Infinity is Bound by Its Statements to the USPTO Limiting the Scope of the Claims ................. 22

        3.    Infinity's Proposed Construction Ignores Its Own Statements to the USPTO ................................................................................ 26

    D.    "Using an Unmodified Standard Protocol for Shifting the Personal Computer to a Connected Mode" ........................................................ 29

    E.    The "Isolating" Terms ......................................................................... 32

    F.    The "Facsimile Signals" Terms ........................................................... 34

    G.    "Using a Standard Protocol of the Facsimile Machine" ...................... 36

    H.    The "Digital Signals" Terms ................................................................ 37

    I.    The "Bidirectional" Terms ................................................................... 38

    J.    Indefinite Step-Plus-Function Claim Terms ....................................... 40

        1.    The "activating," "conditioning," and "arranging" Limitations Are Step-Plus-Function Claim Terms Subject to 35 U.S.C. § 112, ¶ 6 .......... 40

        2.    Infinity Has Made No Effort to Show that, If These Terms Are Subject to 35 U.S.C. § 112, ¶ 6, They Meet the Definiteness Requirement ............................................................................. 42

III.    CONCLUSION ................................................................................................ 44

# TABLE OF AUTHORITIES

## Cases

*3M Innovative Props. Co. v. Tredegar Corp.*,
   725 F.3d 1315 (Fed. Cir. 2013) .......................................................................... 17

*Asyst Tech., Inc. v. Empak, Inc.*,
   268 F.3d 1364 (Fed. Cir. 2001) .......................................................................... 43

*Bayer Intellectual Prop. GmbH v. Warner Chilcott Co., LLC*,
   Civil Action No. 12-1032, 2015 WL 1849015 (D. Del. Apr. 21, 2015).................. 10

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
   616 F.3d 1249 (Fed. Cir. 2010) .......................................................................... 37

*Bed-Check Corp. v. Ultimate Safety, Inc.*,
   2003 U.S. Dist. LEXIS 27845 (N.D. Okla. Nov. 24, 2003) .................................. 41

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001) ............................................................................ 4

*Berkheimer v. Hewlett-Packard Co.*,
   No. 12-cv-9023, 2015 WL 4999954 (N.D. Ill. Aug. 21, 2015) .......................... 2, 22

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006) ............................................................................ 29

*Butamax Adv. Biofuels LLC v. Gevo, Inc.*,
   117 F. Supp. 3d 632 (D. Del. 2015)..................................................................... 10

*Callpod, Inc. v. GN Netcom, Inc.*
   2009 U.S. Dist. LEXIS 51103 (N.D. Ill. Mar. 6, 2009) ....................................... 41

*Chimie v. PPG Indus.*,
   402 F.3d 1371 (Fed. Cir. 2005) ............................................................ 1, 5, 24, 37

*Enzo Biochem Inc. v. Applera Corp.*,
   780 F.3d 1149 (Fed. Cir. 2015) .......................................................................... 29

*In re Schreiber*,
   128 F.3d 1473 (Fed. Cir. 1997) .......................................................................... 41

*In re Walter*,
   698 F. App'x 1022 (Fed. Cir. 2017) ..................................................................... 21

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ..................................................................... 29, 41

*Intellectual Ventures I, LLC v. Canon Inc.*,
  143 F. Supp. 3d 143 (D. Del. 2015) ..................................................... 10

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) ........................................................... 41

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003) ........................................................... 42

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004) ........................................................... 38

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ............................................................... 20, 21

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ................................................ 1, 4, 24, 25

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .......................................... 7, 17, 18, 32

*Scimed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ............................................................. 7

*Seachange Int'l, Inc. v. C-COR, Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005) ........................................................... 40

*Source Vagabond Sys., Ltd. v. Hydrapak, Inc.*,
  753 F.3d 1291 (Fed. Cir. 2014) ............................................................. 6

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ................................................... 1, 6, 24

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
  164 F.3d 1372 (Fed. Cir. 1998) .............................................. 25, 31, 39

*St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co.*,
  691 F. Supp. 2d 538 (D. Del. 2010) ....................................................... 2

*SynQor, Inc. v. Artesyn Techs., Inc.*,
  No. 2:07-CV-497, 2010 WL 2991037 (E.D. Tex. July 26, 2010) ........................... 33

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  789 F.3d 1335 (Fed. Cir. 2015) ........................................................... 21

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
  308 F.3d 1193 (Fed. Cir. 2002) ..................................................... 33, 41

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
    733 F. App'x 1011 (Fed. Cir. 2018) ................................................................. 10, 21, 22

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
    595 F.3d 1340 (Fed. Cir. 2010) ................................................................................. 12

*Transcend Med., Inc. v. Glaukos Corp.*,
    Civ. Action No. 13-830, 2015 U.S. Dist. LEXIS 124863 (D. Del. Sept. 18, 2015) ................ 21

*UltimatePointer, L.L.C. v. Nintendo Co.*,
    816 F.3d 816 (Fed. Cir. 2016) ................................................................................... 7

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ............................................................................. 4, 7

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) .......................................................................... 40, 41

**Statutes**

35 U.S.C. § 112, ¶ 6 ............................................................................................. 42, 43

35 U.S.C. § 254 ....................................................................................................... 19

**TABLE OF EXHIBITS**

| Exhibit | Description | Bates Numbers |
|---|---|---|
| 1 | U.S. Patent No. 6,894,811 (with Reexamination Certificates C1-C3) | Infinity0037564-Infinity0037594 |
| 2 | U.S. Patent No. 7,489,423 (with Reexamination Certificates C1-C3) | Infinity0037595-Infinity0037622 |
| 3 | U.S. Patent No. 8,040,574 (with Reexamination Certificates C1 and C2) | Infinity0037623-Infinity0037646 |
| 4 | U.S. Patent No. 8,294,915 (with Reexamination Certificates C1 and C2) | Infinity0037647-Infinity0037670 |
| 5 | Reexamination Control No. 90/009,901, Sept. 21, 2011 Office Action | Infinity0001194-Infinity0001204 |
| 6 | Reexamination Control No. 90/009,902, Sept. 21, 2011 Office Action | Infinity0002482-Infinity0002490 |
| 7 | Reexamination Control No. 90/009,901, Apr. 25, 2012 Second Supplemental Amendment | Infinity0001842-Infinity0001849 |
| 8 | Reexamination Control No. 90/009,902, Feb. 21, 2012 Amendment | Infinity0003340-Infinity0003345 |
| 9 | Reexamination Control No. 90/009,901, June 1, 2012 Notice of Intent to Issue Ex Parte Reexamination Certificate | Infinity0001852-Infinity0001855 |
| 10 | Reexamination Control No. 90/009,902, Mar. 13, 2012 Notice of Intent to Issue Ex Parte Reexamination Certificate | Infinity0003411-Infinity0003414 |
| 11 | Reexamination Control No. 90/012,816, Apr. 24, 2013 Office Action | Infinity0008651-Infinity0008661 |
| 12 | Reexamination Control No. 90/012,815, Apr. 24, 2013 Office Action | Infinity0005412-Infinity0005420 |
| 13 | Reexamination Control No. 90/012,817, Apr. 29, 2013 Office Action | Infinity0041921-Infinity0041928 |
| 14 | Reexamination Control No. 90/012,818, Apr. 24, 2013 Office Action | Infinity0012095-Infinity0012104 |
| 15 | Reexamination Control No. 90/012,816, July 24, 2013 Amendment | Infinity0008794-Infinity0008827 |
| 16 | June 10, 2013 Proposed Interview Agenda, submitted in Reexamination Control Nos. 90/012,815; 90/012,816; 90/012,817; 90/012,818 | Infinity0008709-Infinity0008765 |
| 17 | Reexamination Control No. 90/012,816, Feb. 5, 2014 Notice of Intent to Issue Ex Parte Reexamination Certificate | Infinity0009593-Infinity0009600 |
| 18 | Reexamination Control No. 90/012,815, Feb. 5, 2014 Notice of Intent to Issue Ex Parte Reexamination Certificate | Infinity0006143-Infinity0006150 |

| Exhibit | Description | Bates Numbers |
|---|---|---|
| 19 | Reexamination Control No. 90/012,817, Feb. 5, 2014 Notice of Intent to Issue Ex Parte Reexamination Certificate | Infinity0042445-Infinity0042450 |
| 20 | Reexamination Control No. 90/012,818, Feb. 5, 2014 Notice of Intent to Issue Ex Parte Reexamination Certificate | Infinity0012855-Infinity0012862 |
| 21 | Reexamination Control No. 90/013,208, June 19, 2014 Decision Granting Ex Parte Reexamination | Infinity0022658-Infinity0022688 |
| 22 | Reexamination Control No. 90/013,207, June 4, 2014 Decision Granting Ex Parte Reexamination | Infinity0015835-Infinity0015863 |
| 23 | Reexamination Control No. 90/013,209, June 4, 2014 Decision Granting Ex Parte Reexamination | Infintiy0030706-Infinity0030717 |
| 24 | Reexamination Control No. 90/013,210, June 4, 2014 Decision Granting Ex Parte Reexamination | Infinity0035961-Infinity0035974 |
| 25 | Reexamination Control No. 90/013,208, Nov. 12, 2014 Response to Office Action | Infinity0022825-Infinity0022836 |
| 26 | Reexamination Control No. 90/013,208, Aug. 26, 2016 Notice of Intent to Issue Ex Parte Reexamination Certificate | Infinity0024503-Infinity0024513 |
| 27 | Dec. 10, 2013 Interview Handouts, submitted in Reexamination Control Nos. 90/012,815; 90/012,816; 90/012,817; 90/012,818 | Infinity0009185-Infinity0009186 |
| 28 | U.S. Patent No. 5,452,106 to Perkins | DefInf_00003593-DefInf_00003607 |
| 29 | Newton's Telecom Dictionary (11th ed. 1996) (excerpts) | DefInf_00000395-DefInf_00000399 |
| 30 | U.S. Patent No. 5,598,533 to Yokota et al. | DefInf_00003566-DefInf_00003592 |
| 31 | June 17, 2013 Interview Slides, submitted in Reexamination Control Nos. 90/012,815; 90/012,816; 90/012,817; 90/012,818 | Infinity0008767-Infinity0008791 |
| 32 | U.S. Patent No. 5,218,458 to Kochis et al. | DefInf_00003631-DefInf_00003642 |
| 33 | U.S. Patent Application No. 08/669,056, Original Claims, filed on June 25, 1996 | Infinity0037708-Infinity0037715 |
| 34 | U.S. Patent Application No. 08/669,056, July 20, 1999 Office Action | Infinity0037802-Infinity0037810 |
| 35 | U.S. Patent Application No. 08/669,056, May 25, 2002 Amendment | Infinity0037902-Infinity0037925 |
| 36 | U.S. Patent Application No. 08/669,056, Apr. 29, 2004 Amendment | Infinity0038051-Infinity0038076 |

| Exhibit | Description | Bates Numbers |
|---|---|---|
| 37 | Reexamination Control Nos. 90/013,208, Sept. 12, 2014 Office Action | Infinity0022694-Infinity0022756 |
| 38 | Reexamination Control Nos. 90/012,816, Dec. 30, 2013 Response to Final Office Action | Infinity0009402-Infinity0009428 |
| 39 | Reexamination Control Nos. 90/012,816, Declaration One of Dr. Marc E. Levitt dated Dec. 27, 2013 | Infinity0009189-Infinity0009204 |
| 40 | Reexamination Control Nos. 90/009,901, Mar. 12, 2012 Advisory Action | Infinity0001824-Infinity0001827 |
| 41 | Reexamination Control Nos. 90/013,208, Apr. 13, 2015 Response to Final Office Action | Infinity0023215-Infinity0023232 |
| 42 | Reexamination Control Nos. 90/013,208, May 7, 2015 Advisory Action | Infinity0023554-Infinity0023573 |
| 43 | Reexamination Control No. 90/013,208, Nov. 12, 2014 Response to Office Action, Appendix A (excerpt) | Infinity0022837-Infinity0022852 |
| 44 | Reexamination Control Nos. 90/012,816, Declaration of Mark Myslinski dated July 23, 2013 (without exhibits) | Infinity0008828-Infinity0008834 |
| 45 | July 17, 2017 Interview Slides, submitted in Reexamination Control Nos. 90/012,815; 90/012,816; 90/012,817; 90/012,818 | Infinity0008918-Infinity0008932 |
| 46 | Reexamination Control Nos. 90/012,816, Dec 24, 2013 Interview Summary | Infinity0009178-Infinity0009181 |
| 47 | Dec. 5, 2013 Interview Agenda, submitted in Reexamination Control Nos. 90/012,815; 90/012,816; 90/012,817; 90/012,818 | Infinity0009182-Infinity0009184 |
| 48 | Nov. 18, 2013 Interview Request, submitted in Reexamination Control Nos. 90/012,815; 90/012,816; 90/012,817; 90/012,818 | Infinity0009163-Infinity0009164 |
| 49 | The IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed. 1997) (excerpts) | DefInf_00000414-DefInf_00000419 |
| 50 | McGray-Hill Dictionary of Scientific and Technical Terms (5th ed. 1994) (excerpts) | DefInf_00000407-DefInf_00000413 |
| 51 | Reexamination Control Nos. 90/009,901, Feb. 10, 2012 Office Action | Infinity0001792-Infinity0001794, Infinity0001806-Infinity0001807, Infinity0001795-Infinity0001804 |
| 52 | Reexamination Control Nos. 90/013,208, Dec. 7, 2015 Examiner's Answer | Infinity0024242-Infinity0024302 |
| 53 | Reexamination Control Nos. 90/009,901, Nov. 21, 2011 Amendment | Infinity0001212-Infinity0001224 |
| 54 | Reexamination Control No. 90/012,816, Declaration Two of Dr. Marc E. Levitt dated Dec. 27, 2013 (without exhibits) | Infinity0009205-Infinity0009211 |

| Exhibit | Description | Bates Numbers |
|---|---|---|
| 55 | U.S. Patent Application No. 08/226,278, Nov. 6, 1995 Amendment | DefInf_00000100-DefInf_00000135 |
| 56 | U.S. Patent Application No. 08/669,056, Oct. 20, 1999 Amendment | Infinity0037811-Infinity0037821 |
| 57 | Plaintiff Infinity Computer Products, Inc.'s Disclosure of Asserted Claims and Infringement Contentions, Appendix A, served on Feb. 16, 2018 | N/A |
| 58 | Reexamination Control No. 90/012,818, July 24, 2013 Amendment | Infinity0012225-Infinity0012239 |
| 59 | A Dictionary of Computing (4th ed. 1997) (excerpts) | DefInf_00000427-DefInf_00000429 |
| 60 | IBM Dictionary of Computing (10th ed. 1993) | DefInf_00000420-DefInf_00000426 |
| 61 | U.S. Patent Application No. 08/669,056, Apr. 17, 2000 Amendment | Infinity0037830-Infinity0037848 |
| 62 | U.S. Patent Application No. 08/669,056, Nov. 23, 2001 Amendment | Infinity0037853-Infinity0037873 |
| 63 | Reexamination Control Nos. 90/013,208, Oct. 31, 2014 Interview Summary | Infinity0022759-Infinity0022763 |
| 64 | U.S. Patent Application No. 08/669,056, Jan. 14, 2005 Notice of Allowance | Infinity0038115-Infinity0038132 |
| 65 | Reexamination Control No. 90/013,208, Declaration One of Dr. Marc E. Levitt dated Nov. 2, 2014 | Infinity0022941-Infinity0022951 |
| 66 | June 10, 2013 Proposed Interview Agenda, submitted in Reexamination Control Nos. 90/012,815; 90/012,816; 90/012,817; 90/012,818 | Infinity0012167-Infinity0012223 |
| 67 | Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Pre-Issuance Damages and Absolute Intervening Rights in Case No. 2:12-cv-06796-NIQA (E.D. Pa.) Mar. 9, 2018 (Dkt. 79) | N/A |
| 68 | Declaration of Ivan Zatkovich in Support of Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Pre-Issuance Damages and Absolute Intervening Rights in Case No. 2:12-cv-06796-NIQA (E.D. Pa.) Mar. 9, 2018 (Dkt. 79-12) | N/A |

| Exhibit | Description | Bates Numbers |
|---|---|---|
| 69 | Declaration of Dr. Marc E. Levitt in Support of Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Pre-Issuance Damages and Absolute Intervening Rights in Case No. 2:12-cv-06796-NIQA (E.D. Pa.) Mar. 9, 2018 (Dkt. 79-13) | N/A |
| 70 | Plaintiff Infinity's Response in Opposition to Defendants' Motion for Summary Judgment of Limitation on Pre-Issuance Damages and Absolute Intervening Rights in Case No. 18-463-LPS-CJB (D. Del.) Aug. 10, 2018 (Dkt. 120) | N/A |
| 71 | U.S. Patent Application No. 08/669,056 Nov. 11, 2004 Amendment | Infinity0038097-Infinity0038113 |
| 72 | Excerpts of Deposition of Dr. Marc E. Levitt taken October 11, 2018 | N/A |
| 73 | Document entitled "Supplemental Data for 2nd Interview Agenda" submitted July 17, 2013 in Reexamination Control Nos. 90/012,815; 90/012,816; 90/012,817; 90/012,818 | Infinity0008909-Infinity0008913 |
| 74 | Reexamination Control No. 90/012,816, Jan. 16, 2014 Supplemental Patent Owner Statement of Interview | Infinity0009429-Infinity0009432 |
| 75 | Reexamination Control No. 90/013,208, Document entitled "811 support in 558" dated July 2014 | Infinity0022797-Infinity0022818 |

# I.      INTRODUCTION

The purpose of claim construction is to determine, as a matter of law, what patent claims mean and thus the scope of the claimed invention.  A number of principles guide the Court in this process.  Among these is the fundamental tenet of patent law that claims cannot be "construed one way in order to obtain their allowance and in a different way against accused infringers."  *Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).  In other words, a patent owner cannot have it both ways.  Where a patent applicant disclaimed an interpretation of the claims during prosecution—as Infinity repeatedly did—it cannot later seek a construction that recaptures that same disclaimed interpretation and effectively eliminates the bases upon which the U.S. Patent and Trademark Office ("USPTO") allowed the claims to issue.  *See, e.g.*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer . . . preclude[s] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution[.]"); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

As explained in Defendants' Opening Claim Construction Brief (Dkt. No. 111) ("Def. Br."), Infinity had a years-long dialogue with the USPTO about the scope of the claims.  Infinity repeatedly distinguished its claims from the prior art, including references like *Yokota*, *Perkins*, *Kochis*, and *Kang*.  Defendants' proposed claim constructions are based on Infinity's own words during those prosecutions and multiple reexaminations, and give effect to Infinity's disavowals of certain claim scope made to avoid having the Asserted Claims deemed unpatentable.  Although Infinity urges this Court to look past the prosecution history and specification, it cannot escape the legal ramifications of its own actions and statements in the USPTO.

As Defendants have also explained, in the case of at least two terms—"passive link" and

1

"generic send/receive driver communications software"—Infinity took diametrically opposed positions during reexamination to preserve the validity of the Patents-in-Suit.  These irreconcilable statements make it impossible for a person of skill in the art to understand what the claims mean, rendering them indefinite and therefore invalid.  It is no answer that the USPTO itself did not find these terms indefinite because "once claim construction is before a court, the court is obligated to construe claims *de novo* as a matter of law, without according any deference to the PTO's construction."  *St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co.*, 691 F. Supp. 2d 538, 550 (D. Del. 2010); *see also Berkheimer v. Hewlett-Packard Co.*, No. 12-cv-9023, 2015 WL 4999954, at *10 (N.D. Ill. Aug. 21, 2015) (rejecting argument that issue of indefiniteness was resolved during prosecution).

Unable to rationalize its own inconsistent statements to the USPTO or otherwise refute Defendants' evidence, Infinity's Responsive Claim Construction Brief (Dkt. No. 122) ("Resp.") largely ignores them.  Indeed, Infinity does not address many of Defendants' key arguments, and has nothing to say about most of the evidence.  As an example, if the Court were to construe "generic send/receive driver communications software," Defendants' propose that "generic" be construed as "off-the-shelf and neither customized, proprietary, manufacturer-specific, nor tailored for a specific application or process."  Defendants make this proposal because this is what Infinity told the USPTO that "generic" meant.  *See* Def. Br. at 30-35 (citing evidence); *infra* at section II.C.2.a.  While Infinity's Responsive Brief rejects this construction, it is silent with respect to the import of Infinity's own statements, or the law that requires Infinity's disclaimers to be given effect.  Infinity takes a similar approach to most of the other claim terms:  it cherry-picks the evidence it prefers, and ignores the rest.

Infinity's assertion that numerous terms do not need to be construed, as well as its several

proposed alternative constructions (many of which Infinity has changed since Defendants filed their Opening Brief), are nothing more than invitations to error.  As explained below, Infinity's proposed constructions are inconsistent with the specification and Infinity's own statements to the USPTO.  They are a transparent effort to read the claims broadly in litigation—far more broadly than Infinity construed them when trying to persuade the USPTO to issue the claims—so that Infinity can maintain its far-fetched infringement theories against Defendants' multi-function printers.  If Infinity had construed the asserted claims during prosecution and reexamination the same way it asks this Court to construe them now, it could not have overcome the prior art cited by the USPTO.  But with the reexamination battle behind it, Infinity now unabashedly twists and turns the language to keep its infringement theories alive.  Infinity's approach to claim construction is flatly contrary to binding Federal Circuit precedent, and its proposed constructions should be rejected.

## II.    ARGUMENT

### A.    The "Facsimile Machine" Terms

| Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "facsimile machine" / "fax machine"<br><br>'811, cl. 1, 2, 4, 6, 7, 18-20<br>'423, cl. 1-4, 6<br>'574, cl. 1, 2, 4, 5, 7, 8<br>'915, cl. 1, 6-9, 14, 15 | "a device that transmits scanned information, or receives information for printing, only in compliance with a CCITT/ITU-T facsimile standard" | No construction necessary<br><br>or<br><br>"a device that is capable of sending and receiving a fax, including associated scan and print functionality"[3] |

---

[3] Plaintiff's Responsive Claim Construction Brief includes, for the first time, new or revised definitions for four terms: "facsimile machine"; "using an unmodified standard protocol for shifting the personal computer to a connected mode"; "by-passing or isolating the facsimile machine and the computer from the public network telephone line" / "both the facsimile machine and [personal] computer isolated from said at least one public network telephone line"; "using a standard protocol of the facsimile machine"; and "digital signals."  Defendants learned of these new constructions for the first time only after Defendants filed their Opening Brief.  For the Court's

Infinity's alternative construction of "facsimile machine" is intended to capture <u>any</u> device that can send or receive a fax, and even includes devices that print from, and scan to, a personal computer <u>without</u> using facsimile machine protocols. Infinity's construction is proposed in a vacuum without regard to the voluminous statements it made in the specification and during the reexaminations to narrow the meaning of the terms, and to avoid the prior art cited by the USPTO.

Under Federal Circuit law, "facsimile machine" must be construed consistent with how the applicant defined it in the intrinsic record. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) (patentee defines a claim term "by implication" by using it throughout the specification in a way consistent with a single meaning); *Omega Eng'g*, 334 F.3d at 1323-24 ("The doctrine of prosecution disclaimer . . . preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.").

In their Opening Brief, Defendants itemized how Infinity repeatedly represented to the USPTO that the claims of the Patents-in-Suit cover only "conventional" or "standard" facsimile machines. For example:

- "FIG. 2c shows another alternative arrangement in which the circuitry 10 of the present invention is integrated into the ***standard*** facsimile machine 30." Ex. 1 at 6:19-21 (emphasis added).

- Figs. 2a-2j of the Patents-in-Suit include "Standard Fax Machine" in every embodiment.

- Infinity presented a slide to the USPTO cataloging numerous instances in which the Patents-in-Suit describe the facsimile machine as being "conventional" or

---

reference, Infinity's revised constructions are reproduced with newly added language <u>underlined</u>, and deleted language ~~struck through~~.

"standard."  Def. Ex. 27.

- "The 811 patent teaches claims that recite a method enabling a *conventional* facsimile machine to communicate with a personal computer, and vice versa, over a communications link using generic (as discussed below) send/receive driver communications software."  Def. Ex. 73 at 1 (emphasis added).

- "The send/receive driver communication software package of the Nachman patents is performing the above functions by interacting with a *standard fax machine*."  Def. Ex. 47 at 2 (emphasis added).

- "Proprietary software . . . could not work as interpreted by the Examiner with *a conventional or standard facsimile machine*."  Def. Ex. 47 at 2 (emphasis added).

- "From the perspective of one of ordinary skill in the art, proprietary send/receive driver communication software, such as that in the prior art references, would not be considered to be GENERAL send/receive driver communication software, it is incapable of operating with *the convention [sic, conventional] or standard facsimile machines disclosed in the specification of the Nachman patents*."  Def. Ex. 47 at 3 (emphasis added).

- "[T]he context of the term 'generic,' which is used in FIG. 2G, is articulated within the body of the specification in multiple places as being in association with *a 'standard[]' facsimile machine*, also shown in FIG 2G.  Further, the instant specification also refers to the use of *'conventional[]' multiple times*."  Def. Ex. 48 at 2 (emphasis added).

- "The Abstract begins with, 'Apparatus for interfacing a *conventional* facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer.'"  Def. Ex. 74 at 2 (emphasis in original).

In its Responsive Brief, Infinity ignores this evidence.  Instead, without even once citing to the intrinsic record, Infinity urges the Court to adopt a broad construction inconsistent with its previous representations.  This proposed construction is improper because patent claims cannot be "construed one way in order to obtain their allowance and in a different way against accused infringers."  *See Chimie*, 402 F.3d at 1384.

Infinity's inconsistent position on "facsimile machine" is exemplified by its arguments about the *Yokota* prior art reference.  As discussed in Defendants' Opening Brief—but ignored in Infinity's response—Infinity argued during the *ex parte* reexamination proceedings that the *Yokota*

reference did not disclose a "fax machine," and that the scope of "facsimile machine" in Infinity's claims was too narrow to cover the device of *Yokota*.  *See* Def. Br. at 21; *see also*, *e.g.*, Def. Ex. 31 at 8 ("*Yokota*'s apparatus is neither a fax or standard computer but a conglomeration of the two.").[4]  Having convinced the USPTO to allow the claims based on that representation, Infinity now proposes a construction of "facsimile machine" that clearly encompasses *any* device that can send or receive a fax—including the device of *Yokota*.  In fact, Infinity's proffered expert, Marc Levitt, admitted during a recent deposition that the *Yokota* device falls within Infinity's litigation construction for "facsimile machine."  *See* Def. Ex. 72 at 85:22-24 (Q: "So, yes, [*Yokota*] does meet your [*i.e.*, Infinity's] definition of facsimile machine?" A: "It meets our definition.").  Infinity cannot have it both ways: having disclaimed a broad interpretation of "facsimile machine" during prosecution, Infinity cannot now seek a construction that captures what it disclaimed.  *See Southwall Techs.*, 54 F.3d at 1576.

Infinity also argues that "facsimile machine" should not be limited to "standard" or "conventional" fax machines because "standard" and "generic"[5] do not appear in the claims themselves.  *See* Resp. at 14.  Claim terms are not, however, construed in a vacuum.  Claim terms are always viewed in the context of the claim, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *accord Source Vagabond Sys., Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (a construction should not "add[] language

---

[4] Defendants' exhibits ("Def. Ex.") 1-71 are attached to the Declaration of Jacob A. Snodgrass in Support of Defendants' Opening Claim Construction Brief (Dkt. No. 113).  Defendants' exhibits 72 -75 are attached to the Declaration of Jacob A. Snodgrass in Support of Defendants' Reply Claim Construction Brief, filed herewith.  Defendants will refer to documents submitted by Infinity as Exhibits 1-9 to the Declaration of Andrew G. DiNovo in Support of Plaintiff's Responsive Claim Construction Brief (Dkt. No. 122-2 *et seq.*) as "Pl. Ex."

[5] Infinity recites the terms "standard" and "generic"; however, it presumably meant to say "standard" and "conventional."

*without support from the specification or prosecution history . . . .*")  (emphasis added).  That context makes clear that Infinity consistently and exclusively described the facsimile machine of the "present invention" as being "conventional" or "standard."   The Court should adopt a construction consistent with this context.  *See UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 823 (Fed. Cir. 2016) (upholding construction of "handheld device" as "handheld direct pointing device" where specification repeatedly emphasizes that the invention is directed to a direct-pointing system); *Verizon*, 503 F.3d at 1308 ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."); *Scimed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001) (limiting claim term based in part on statements in the specification indicating that "<u>all embodiments</u>" of the claimed invention included that limitation) (emphasis added).

Infinity's proposed construction is also inconsistent with the claim language as a whole, which "provide[s] substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.   In the Opening Brief, Defendants explained that the claims expressly define the invention as creating a scanning or printing capability in a facsimile machine.  Def. Br. 18.   Even Plaintiff's expert has acknowledged the claims do this.  *See* Def. Ex. 72 at 197:16-24, 199:25-200:5 ("the claimed inventions begin with a facsimile machine and create the ability to scan to a PC or print from a PC in that facsimile machine."); *see also* Declaration of Dr. Marc E. Levitt in Support of Plaintiff's Responsive Claim Construction Brief (Dkt. No. 122-1) ("Levitt Decl.") at ¶ 33 ("Nachman invented and disclosed . . . a method . . . allowing PCs to utilize any fax machine to create an MFP.").  But Infinity's proposed definition of "facsimile machine" covers the *opposite* scenario:  creating facsimile capability in a scanning or printing machine.  This runs completely contrary to the entire point of these patents.

Finally, while Infinity disputes whether "facsimile machine" should be limited to a standard or conventional fax machine, it does <u>not</u> rebut Defendants' evidence of what a person of ordinary skill in the art at the time of the invention would understand a "standard" or "conventional" facsimile machine to be.   In their opening papers, Defendants submitted the declaration of expert Joseph P. Randolph, who opined that "one of ordinary skill in the art would understand that a device that transmits scanned information, or receives information for printing in a manner that is not in compliance with a CCITT/ITU-T facsimile standard, is not a "facsimile machine" as used in the Patents-in-Suit."   Declaration of Joseph P. Randolph in Support of Defendants' Opening Claim Construction Brief (Dkt. No. 112) ("Randolph Dec.") at ¶ 28.   Mr. Randolph further opined that "no facsimile machine that could be fairly characterized as 'conventional' or 'standard' transmitted scanned information or received information for printing in compliance with anything other than a CCITT/ITU-T facsimile standard." *Id.* at ¶ 29.   Infinity did not put in contrary evidence in its Responsive Brief.   In light of this uncontested factual record, the Court should adopt Defendants' proposed construction.[6]

---

[6] Originally, Infinity asked the Court to construe the term as "a device that is capable of sending and receiving a fax." *See* Dkt. No. 104 at 3.   But in its response brief, it changed its proposal to "a device that is capable of sending and receiving a fax<u>, including associated scan and print functionality</u>." *See* Resp. at 13.   Infinity has offered no explanation for why it has changed its view as to how the term would be understood by one of ordinary skill in the art, or what "associated scan and print functionality" means.

B.     "Passive Link"

| Term/Phrase | Defendants' Construction[7] | Plaintiff's Construction |
|---|---|---|
| "passive link"<br><br>'811, cl. 1, 6, 7, 18-20<br>'423, cl. 1, 2, 6<br>'574, cl. 1, 7, 8<br>'915, cl. 1, 9 | Indefinite<br><br>or alternatively<br><br>"a link where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and *said* data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine, *for purposes of providing both scanning or printing data*" | No construction necessary<br><br>or<br><br>"a passive link is one where the initiation of data flow is activated from a setup procedure within the PC and/or the facsimile machine, and the data is transferred with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and facsimile machine" |

1.     "Passive Link" Is Indefinite

All of the asserted claims use the ambiguous phrase "passive link."  Infinity has taken irreconcilable positions with respect to each word in this phrase.  In their Opening Brief, Defendants explained why Infinity's inconsistent application of the term "passive link" rendered the term indefinite.  Infinity argued at times during the original prosecution of the '811 patent and during the reexaminations that modulation/demodulation of data across a link makes it active (*i.e.*, not passive) and, at other times, it argued that modulation/demodulation of data could occur on a passive link.[8]  *See* section II.B.1.a *infra*.  In view of Infinity's conflicting statements, a person of ordinary skill would not understand the scope of a "passive link" with reasonable certainty, *i.e.*,

---

[7] The italicized language reflects the substantive differences between Defendants' and Plaintiff's proposed constructions.

[8] Modulation is the processes of converting digital data to an analog signal, and demodulation is the process of extracting digital data from an analog signal.  *See* Randolph Dec. at ¶ 36.

whether or not the relevant link can involve modulation/demodulation.

In its Responsive Brief, Infinity tries to explain away the ambiguity by making an argument different from, and inconsistent with, the one it made when it introduced "passive link" to the claims. Infinity's arguments are without merit for multiple reasons.[9]

### a.    "Passive"

*Now* Infinity argues that "[m]odulation/demodulation does not itself violate 'passive link.'" Resp. at 17-18. In other words, Infinity argues that a link can be passive even if data is modulated or demodulated for transmission over the link. But when the applicant added the term during the prosecution of the '811 patent, it unequivocally argued that the link in the *Perkins* prior art was not "passive" because it demodulated a facsimile signal:

> Perkins device 3 ***intercepts*** the flow of data before it is transmitted to the computer circuits, ***in order to convert the analog signal into a digital signal format*** . . . .

Def. Ex. 35 at 12 (emphasis added). Infinity acknowledged that this demodulation was performed by the ***fax modem component*** that was part of the "link" at issue in *Perkins*:

> In Perkins' scanning application the signal which is transferred between connector 4 and line interface unit 7 when Perkins card installed in the computer is a standard analog facsimile transmission. After the analog facsimile transmission data enters the card installed in the computer through line interface unit 7, ***the modulated signals are demodulated by modem 9***, and then transferred by Perkins'

---

[9] Infinity cites *Tinnus Enterprises, LLC v. Telebrands Corp.*, 733 F. App'x 1011 (Fed. Cir. 2018) to suggest that "passive link" is not indefinite because the Patent Office did not find it indefinite. Resp. at 17. But *Tinnus* is inapposite. It stands for the proposition that a claim term is presumed to be definite where the *patent examiner* introduces the term into the claim. *See id.* at 1019. In this case, the *applicant*—not the examiner—introduced "passive link" into the claims. *See* Def. Ex. 35. Indeed, if it were the case (as Infinity suggests) that claim terms cannot be indefinite because the Patent Office did not find them as such, then no claim terms would ever be found to be indefinite in subsequent district court litigation. This is simply not the case. *See, e.g.*, *Intellectual Ventures I, LLC v. Canon Inc.*, 143 F. Supp. 3d 143, 163 n.15 (D. Del. 2015) (granting motion for summary judgment of invalidity based on indefiniteness); *Butamax Adv. Biofuels LLC v. Gevo, Inc.*, 117 F. Supp. 3d 632, 638-42 (D. Del. 2015) (same); *Bayer Intellectual Prop. GmbH v. Warner Chilcott Co., LLC*, Civil Action No. 12-1032, 2015 WL 1849015, at *4 (D. Del. Apr. 21, 2015) (same).

microprocessor 10 (located on his card) as digital information.

Def. Ex. 35 at 10 (emphasis added).  Importantly, Infinity's argument during prosecution relied on the functionality of the fax modem 9, rather than processor 10 of *Perkins*.  Infinity then contrasted the *Perkins* design with the '811 patent claims:

> **Contrary to the above**, when the Applicant transfers digital data from the facsimile transceiver through a passive link for scanning to the computer, **the non-intercepted data enters through the RS 232 type connector port of the computer and passes directly to the I/O Bus** and is processed by the receiving circuits … of the computer, **providing a true non intercepted digital signal between the facsimile transceiver and the computer**.

Def. Ex. 35 at 12 (emphasis added); *see also* Def. Br. at 23-24.  In short, Infinity had argued that *Perkins* modulates the data that is to be sent across the link, whereas Infinity's patent claims involve sending digital data across the link *without* modulation.

But Infinity argued the exact opposite during the subsequent reexamination.  As discussed in Defendants' Opening Brief, Infinity argued that Figures 2b-2d of the Patents-in-Suit inherently disclosed a device having a passive link, even though data is modulated for transmission across the link in those figures.  *See* Def. Br. at 25-26.  Thus Infinity took positions in the reexamination inconsistent with its previous distinction of *Perkins*, when it equated "passive" with "no modulation/demodulation."  But this inconsistent treatment of "passive link" means that a person of ordinary skill in the art—looking at the entire intrinsic record—would not be able to understand what that term means with reasonable certainty.

In its Responsive Brief, Infinity tries to argue that the chief distinguishing feature of *Perkins* was an intervening processor.  But that is not what Infinity said when it introduced "passive link" into the claims.  Instead, it equated "passive" to "no modulation/demodulation," and it is a fundamental tenet of claim construction that a person of ordinary skill in the art is entitled to rely on that equivalence in order to understand the scope of what "passive link" means.  *See*

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010) ("The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.") (*quoting Phillips*, 415 F.3d at 1318).

The deposition testimony of Infinity's expert highlights the unresolvable ambiguity of "passive link," given that he took contrary views as to whether Figure 2a of the Patents-in-Suit discloses a device with a "passive link." Early in his deposition, Dr. Levitt testified that Figure 2a of the Patents in Suit—which discloses an Interface Circuit 10 between Standard Fax Machine 20 and PC 40—has a passive link. Ex. 72 at 114:14-23. Infinity has previously argued the same. *See* Ex. 75 at 1 ("Interface Circuit 10 utilizes a switch assembly to facilitate a ***direct and passive connection*** between the PC and the fax machine. The attributes of 'direct' and 'passive' pertain to the transfer of the data between the PC and the facsimile machine. These attributes are disclosed and demonstrated by ***all of the arrangements of the 558 and carried forward through in all of the arrangements in the 811***.") (emphasis added). A few hours later, however, Dr. Levitt had a different opinion. He testified that "Interface Circuit 10 is an – as depicted in Figure 2A is – does not support the passive link." Ex. 72 at 224:1-6. If Infinity and its expert do not understand the meaning of "passive link" clearly enough that they can consistently apply it to the same patent figure, one of ordinary skill in the art certainly would not either.

### b.     "Link"

Infinity argues that the prior art *Perkins* device did not have a passive link due to the existence of the microprocessor 10 in the *Perkins* device over the relevant data path. However, the argument actually highlights the impermissible ambiguity over the scope of "link" in the phrase "passive link."

By way of background, during the original prosecution of the '811 patent, the applicant distinguished the claimed invention from *Perkins* by identifying the relevant data path of the "passive link" as extending from the fax machine, ***through*** the outside connector point of a computer, and ***then to the I/O Bus[10] within the computer***.  *See* Def. Ex. 35 at 12 ("[W]hen Applicant transfers digital data from the facsimile receiver through a passive link … the non-intercepted data enters through the RS 232 type connector port of the computer ***and passes directly to the I/O Bus***….") (emphasis added).  However, during the later reexaminations, Infinity changed its position by arguing that the relevant data path began with the fax machine and ended with the outside connector port of the computer.  Infinity distanced itself from its previous statement that the path extended into the PC to the I/O Bus.  Specifically, applicant (through the declaration of Dr. Levitt) argued that Figures 2b through 2d of the Patents-in-Suit disclosed a passive link because there was no intervening device on the cable that went between the PC and the fax machine.  *See* Def. Ex. 65 at ¶¶ 29-30.



*Fig. 2b*

---

<sup></sup>[10] "I/O Bus" refers to a computer's input/output bus.  This is the circuitry and wiring connecting the computer's Central Processing Unit to other components of the computer.

Def. Ex. 1 at Fig. 2b (annotated).  Relying on Infinity's new, narrower definition of "link," the USPTO allowed the reexamined claims.  *See* Pl. Ex. 3 at 9 ("Figures 2b to 2d … show a passive link, namely via the RJ-11 telephone cable connecting the fax machine directly to the computer. <u>*Accord*</u> Levitt Decl. ¶ 29.") (emphasis added).

In light of this conflicting record, how is a person of ordinary skill in the art supposed to understand the scope of the claimed "link"?  Does the link encompass the data path extending into a computer to the I/O Bus—like Infinity broadly argued to distinguish *Perkins*?  If so, Figures 2b through 2d do not disclose a passive link because the data path to the I/O Bus in these figures extends through Interfacing Circuit 10 within the computer; and as Dr. Levitt admitted during his deposition, a data path extending through that circuit (like the one depicted in Figure 2a of the Patents-in-Suit) is not a passive link.  *See* Ex. 72 at 224:1-6 ("Interface Circuit 10 is an – as depicted in Figure 2A is – does not support the passive link.").  So, according to Infinity:



Def. Ex. 1 at Fig. 2a (annotated)          Def. Ex. 1 at Fig. 2b (annotated)
No "passive link"                          There is a "passive link"
(according to Infinity)                     (according to Infinity)

Alternatively, should a person of ordinary skill in the art understand the "passive link" to extend no further than the outside connector port of the computer—like Infinity narrowly argued during the reexamination proceedings?  If so, then—contrary to Infinity's arguments during the

prosecution of the '811 patent—*Perkins* discloses a "passive link."  Infinity tries to explain away *Perkins* in its Responsive Brief by pointing to an annotated figure from *Perkins*, where device 3 is shown as external to the PC, and then arguing that there is no passive link in that figure because the processor 10 in device 3 is an active intercepting element.  However, Infinity fails to note that *Perkins* discloses another embodiment where "device 3" is located within the PC itself.  *See* Def. Ex. 28 at 9:29-33.  This other *Perkins* embodiment can be depicted as:



If the "passive link" were a cable between a fax machine and PC without an intervening device, then this other *Perkins* embodiment has such a cable.  Moreover, because the relevant data path does not extend through device 3, it never goes through processor 10, and Infinity's argument about the role of that processor as an intervening element is moot.

In short, Infinity has argued irreconcilable interpretations of "passive link" throughout the intrinsic record.  It took different positions depending on whether it was distinguishing *Perkins*, or arguing that Figures 2b-2d of the Patents-in-Suit supported the claims.  Faced with these inconsistencies, a person of ordinary skill in the art would be uncertain as to the scope of "passive

link." Randolph Dec. at ¶ 46. As such, this Court should deem the claims reciting "passive link" indefinite.

### 2. If Not Indefinite, the Court Should Construe "Passive Link" as Defined by Infinity in the Prosecution

If the Court were to conclude that the term "passive link" is not indefinite, it should construe the term—word for word—exactly as the patentee repeatedly defined it. That definition was first stated in the '811 prosecution history (Def. Ex. 36 at 18), and subsequently presented in Dr. Levitt's November 2, 2014 declaration during reexamination, as follows:

28. The definition of passive link as provided during the 811 history is as follows,

> *"The Applicant's definition of a "passive link" is one where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine,* for purposes of providing both scanning or printing data."

Def. Ex. 65 at ¶ 28 (highlighting added). Defendants' proposed construction tracks this definition, verbatim.

Infinity asks the Court to disregard the above-highlighted phrase because a Board opinion quoting Dr. Levitt's definition did not include it. But there is nothing in the Board citation that suggests that the Board was varying or limiting Infinity's definition; if anything, the quote is made to emphasize (in italics) aspects of the definition relevant to the Board's subsequent discussion. *Id.* The quote itself ends with an ellipsis after the word "machine" indicating that there is more to the definition in Dr. Levitt's declaration. *Id.* And even if the Board's excerpting of Infinity's

definition could somehow be interpreted as changing Infinity's definition, controlling case law dictates that this Court still adopt the patentee's original statement.  *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1332 (Fed. Cir. 2013) ("[W]e are guided by legal principles dictating that we rest on the statements made by the patentee over conflicting statements of an examiner because it is the patentee's words that define the claim.").

Infinity argues that inclusion of the phrase "for purposes of providing both scanning or printing data" is not required in the context of the asserted claims.  Quoting claim 1 of the '811 patent,[11] Infinity argues that the plain claim language does not require the phrase.  But the claim Infinity quotes is *identical* to the one before the Examiner when Infinity originally proffered the entire definition of 'passive link'—including the phrase at issue.  *Compare* Resp. at 18-19, *with* Def. Ex. 36 at 1-2 (application claim 27, which issued as patent claim 1 before it was subsequently amended and corrected).  Infinity also complains that adopting its full definition would create ambiguity in the claims.  Infinity misses the mark.  Having already provided an explicit definition to the USPTO, Infinity cannot propose something different now.  *See, e.g.*, *Phillips*, 415 F.3d at 1316 (patentee may assign a specific meaning to claim term by acting as a lexicographer).[12]

---

[11] Infinity actually misquotes claim 1 of the '811, by failing to include claim elements added during the reexaminations and reflected in certificates of correction.

[12] Infinity foreshadows an attempt to diverge further from the definition it gave to the USPTO. In particular, Infinity suggests that the exclusion of an "intervening apparatus or signal interception," which appears in both parties' proposed constructions, means only that there is "no apparatus along the route must actually intervene or intercept the image data signal for modification."  Resp. at 19-20.  Thus, Infinity asserts that the "link" is still "passive" if the link includes, as intervening apparatuses, "interface circuits including electrical current drivers."  *See id.*  This would be a blatant rewrite of either proposed construction.  First, this ignores that, in the phrase at issue, there is an "or" between two clauses identifying a noun or nouns:  "with [1] no intervening **apparatus** *or* [2] signal interception by a processing **element** or any active **component**."  Accordingly, if *either* condition is met, then there is no "passive link."  At his deposition, Dr. Levitt agreed that this was the correct understanding of the construction. Def. Ex. 72 at 220:15-223:4.  In contrast, Infinity's interpretation describes only clause [2], but gives no effect to the "no intervening apparatus" clause.  Second, Infinity attempts to improperly narrow

C.      The "Generic Send/Receive Driver Communications Software" Terms

| Term/Phrase | Defendants' Construction | Plaintiff's Construction |
| --- | --- | --- |
| "generic send/receive driver communications software" / "generic send receive driver communications software" / "generic send or receive communications software" / "generic send and receive driver communications software"<br><br>'811, cl. 1, 6, 18-20<br>'423, cl. 1, 2, 6<br>'574, cl. 1, 7, 8<br>'915, cl. 1, 9 | Each of the claim phrases as a whole is indefinite.<br><br>Alternatively, the term "generic" means:<br><br>"off-the-shelf and neither customized, proprietary, manufacturer-specific, nor tailored for a specific application or process"; and<br><br>the "send/receive driver communications software" terms mean:<br><br>"software that controls a peripheral and provides all instructions necessary to accomplish the tasks of printing from the personal computer to the facsimile machine and/or scanning from the facsimile machine to the personal computer, in a standard CCITT/ITU-T facsimile format" | No construction necessary<br><br>or<br><br>"driver communications software capable of interfacing with a facsimile machine using standard communications protocols on a standard PC" |

It is black letter law that claim construction starts with the intrinsic evidence, *i.e.*, the claim language, the patent specification, and the prosecution history.  *See, e.g.*, *Phillips*, 415 F.3d at 1329-30.  In discussing "generic send/receive driver software," Infinity is flatly wrong about the claim language, never considers the specification, and avoids almost all of the relevant prosecution history.

---

clause [2] when it suggests that the "active component" must be "a processor that performs processing on the image data."  Resp. at 17.  Neither the portion of Dr. Levitt's declaration cited by Infinity nor any other evidence supports this, and indeed Dr. Levitt explained that "active components" are not limited to processors.  Def. Ex. 72 at 111:12-112:20, 219:3-220:14.

Infinity is incorrect about the language of the '811 patent's claims.  Inexplicably, Infinity asserts that the term "generic" does not appear in the claims of the '811 patent.  Resp. 20 & 23; *see also id*. at 19 (misquoting claim 1).   In fact, during reexamination, Infinity amended independent claims 1, 6, 18, 19 and 20 of the '811 patent to each recite "generic" send/receive driver communications software.  *See* Def. Ex. 1 ('811 patent) at Ex Parte Reexamination Certificate dated July 31, 2012 (indicating amendments), Cert. of Correction dated Mar. 12, 2013 (correcting amended clams 1, 6 and 18-20 to recite "generic"), and Cert. of Correction dated July 22, 2014 (same corrections to recite "generic," and further corrections to claim 19)[13]; *see also* Def. Br. at App'x A (text of asserted claims as amended and corrected).

Infinity similarly ignores much of the reexamination prosecution history.   "Generic send/receive driver communications software" was the most important and most discussed claim term during all three rounds of reexamination.   The term appears in 13 of the 14 asserted independent claims, and in those 13 claims it is the limitation on which the USPTO relied to find the claims patentable—that is, the use of *generic* send/receive communications software was the only thing that distinguished those claims over the prior art.[14]  Def. Br. at 12-13.  During the first round of reexaminations, Infinity amended five of six independent claims of the '811 patent and all independent claims of the '423 patent to require "generic" send/receive driver communications

---

[13] *See generally* 35 U.S.C. § 254 ("Whenever a mistake in a patent, incurred through the fault of the Patent and Trademark Office, is clearly disclosed by the records of the Office, the Director may issue a certificate of correction stating the fact and nature of such mistake, under seal, without charge, to be recorded in the records of patents. A printed copy thereof shall be attached to each printed copy of the patent, and such certificate shall be considered as part of the original patent. Every such patent, together with such certificate, shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form.").

[14] The fourteenth asserted independent claim also was amended during reexamination, as discussed in section II.D, *infra*.

software.  *Id*.  Infinity also made the same amendments to the '574 and '915 patents during the second round of reexamination, and argued at length that even under the Examiner's understanding of the claim language, "generic send/receive driver communications software" had a specific set of more defined meanings that distinguished the Patents-in-Suit over otherwise-invalidating prior art.  *Id*.

"Generic send/receive driver communications software" was also the key issue in the third round of reexaminations.  Infinity was able to avoid having the Patents-in-Suit invalidated only by arguing that they were entitled to a 1994 priority date—an argument that turned on Infinity's ability to convince the Examiner that the specification for the parent patent of the Patents-in-Suit supported this claim language.  Infinity was able to successfully make that argument only by contradicting its earlier arguments about the meaning of the claim term.  *See* Def. Br. at 14, 27-30.

Infinity, however, would whistle past the prosecution histories.  Infinity ignores its contradictory statements about whether it is the "software" or the "communications" that must be generic, and its repeated statements to the USPTO limiting the scope of this term.  Instead, Infinity proposes a definition that it implies was adopted by the Examiner.  This is not correct.  Infinity's proposed construction was never used (or even suggested) at any point during the reexaminations, and the construction would impermissibly eliminate both "generic" and "send/receive" from the claim language.

1.     **The "Generic Send/Receive Driver Communications Software" Terms are Indefinite.**

These claim terms are indefinite because Infinity has made irreconcilable statements that leave a person of ordinary skill in the art without reasonable certainty as to the scope of what is claimed.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) (claim is indefinite and invalid if it fails to "inform those skilled in the art about the scope of the invention

with reasonable certainty").  In the first two rounds of reexamination, Infinity repeatedly and specifically told the USPTO that in the phrase "generic send/receive driver communications software" "generic" modifies "software."  Def. Br. at 28-29 (citing Def. Ex. 16 at 25, 29, 35, 37, Def. Ex. 38 at 5 and 10, Def. Ex. 39 at ¶ 18, Def. Ex. 40 at Infinity0001827).  In the third round of reexaminations, however, Infinity flip-flopped and instead asserted that "generic" modifies "communications," not "software."  *Id*. at 29-30 (citing Def. Ex. 41 at 5-6). These statements are both binding and irreconcilable, and render all claims that include this term indefinite and invalid. *Nautilus*, 134 S. Ct. at 2129; *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015); *In re Walter*, 698 F. App'x 1022, 1027 (Fed. Cir. 2017) (unpublished).

In its Responsive Brief, Infinity does not deny that it flip-flopped on the meaning of this key claim term.  Nor does Infinity suggest that its assertion that the claims require "generic" software can be reconciled with its later contention that the claims cover "generic" communications.  Infinity merely argues that the USPTO accepted Infinity's latter argument—and therefore, its prior inconsistent statements should be ignored.  Tellingly, Infinity does not cite a single case suggesting that the USPTO's acceptance is entitled to any deference on this point.  The Federal Circuit cases discussed in Defendants' Brief but ignored by Infinity—*Teva* and *In re Walter*—are directly contrary.  *Teva*, 789 F.3d at 1345 (inconsistent statements to USPTO rendered claims indefinite); *In re Walter*, 698 F. App'x at 1027 (unpublished) (same); *see also Transcend Med., Inc. v. Glaukos Corp.*, Civ. Action No. 13-830, 2015 U.S. Dist. LEXIS 124863, at *22 (D. Del. Sept. 18, 2015) (same).

The one case Infinity cites, *Tinnus*, does not help Infinity. First, as discussed above in section II.B.1, that case involved language added to the claims by the examiner not—as in this case—by the patent applicant.  *Tinnus*, 733 F. App'x at 1019.  Second, in *Tinnus*, different claim

language in a patent with a different specification and a different prosecution history was found to be not indefinite.  Third, the passage of *Tinnus* cited by Infinity is part of a robust body of case law addressing the circumstances under which words of degree (*e.g.*, "substantially") do, or do not, meet the definiteness requirement.  *Id*. 1018-19.  That issue is not before the Court, and *Tinnus* simply does not apply.  Fourth *all* claim terms are, as Infinity phrases it, "blessed" by the Examiner in the sense that he or she allowed the patent to issue with particular claim language.  The Examiner's decision to allow the amended claims is no more or less of a factor here than in any other patent case.  *See Berkheimer*, 2015 WL 4999954, at *10 ("'[T]he deference that is due to a qualified government agency presumed to have done its job' is already reflected in 'the clear and convincing evidence burden for proving invalidity.'") (*citing Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012)).  Here, the evidence more than meets the clear and convincing standard for finding the claims indefinite and invalid.

**2.     Should the Court Decide to Construe the "Generic Send/Receive Driver Communications Software" Terms, Infinity is Bound by Its Statements to the USPTO Limiting the Scope of the Claims**

Because the "generic/send receive driver communications software" terms are indefinite, the Court need not reach the issue of how they should be construed.  If, however, the Court does not find these terms to be indefinite, Infinity should be held to its repeated statements about what the patents mean by the two constituent parts of this term: "generic" and "send/receive driver communications software."

**a.     "Generic"**

"Generic" should be defined as "off-the-shelf and neither customized, proprietary, manufacturer-specific, nor tailored for a specific application or process."  Def. Br. at 31-35. This construction is taken directly from Infinity's own words characterizing the term:

- "The 'generic send/receive driver communications software' of the 811 patent

would be understood by one of ordinary skill in the art to be communications software that is **not customized** and **not tailored to a specific application or process**, and in this sense a characteristic of commercial **off-the-shelf** communications software." Def. Ex. 15 at 14 (emphasis added).

- "The prior art asserted by Richo [sic] utilizes either of, additional communications protocol or lower level driver routines (ISRs) as part of the send/rec driver comm software, and that are a) particular to the application of printing and scanning (or in one case also faxing), and as such are **'customized or tailored' to these particular processes**, or b) are not general purpose as the communication software is **manufacturer-specific** and not capable of communicating with generic software that is available from other manufacturers, for the purposes of printing and scanning." Def. Ex. 16 at 5 (distinguishing claimed invention from prior art) (emphasis added).

- "Patent Owner asserted that Generic in the context of the specification for its use of 'conventional' and 'standard' **limits the invention to non-proprietary 'send/receive communications software'** that uses standard telefax and standard PC." Def. Ex. 46 at 2 (emphasis added).

*See* Def. Br. at 31-35 (citing additional evidence). Infinity summarized some of these key points in a slide presented to the USPTO:



Def. Ex. 31 at 2.

Confronted with this slide at his deposition, Dr. Levitt agreed that he "didn't see anything here that [he] would find inaccurate in the context of Figure 2G of the patents-in-suit." Def. Ex. 72 at 224:7-226:4. Outside of the amended claims, "generic" appears only in Figure 2g of the

Patents-in-Suit.

Infinity's statements are binding, and are clear and unequivocal disclaimers of the meaning it now proposes.  *See Chimie*, 402 F.3d at 1384 (courts rely on the prosecution history to help "ensure[] that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."); *Omega Eng'g*, 334 F.3d at 1323 ("The doctrine of prosecution disclaimer . . . preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."); *Southwall*, 54 F.3d at 1576 ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.") (citations omitted).

Notably, Infinity's Responsive Brief does not address this evidence. Failure to address a key argument is a concession.

### b.    "Send/Receive Driver Communications Software"

If not found indefinite, "send/receive driver communications software" should be construed as "software that controls a peripheral and provides all instructions necessary to accomplish the tasks of printing from the personal computer to the facsimile machine and/or scanning from the facsimile machine to the personal computer, in a standard CCITT/ITU-T facsimile format." *See* Def. Br. at 35-37 (citing evidence).  Specifically, a person of ordinary skill in the art would understand "send/receive driver communications software" to:

   i.    be "software that controls a peripheral" because that is what a "driver" is;

   ii.    "provide[] all instructions necessary to accomplish the tasks of printing from the personal computer to the facsimile machine and/or scanning from the facsimile machine to the personal computer" because Infinity repeatedly made it clear that

the claimed generic software provides *all* of the necessary instructions, and distinguished prior art that provided fewer that all necessary instructions; and

iii.   provide those instructions "in a standard CCITT/ITU-T facsimile format" because the complete set of instructions necessary to print or scan must be provided in the only language fax machines speak, *i.e.*, a standard CCITT/ITU-T facsimile format.

*Id*.

Infinity again fails to address in any substantial way Defendants' proposed construction, or supporting evidence.  Infinity does not, for example, dispute that the patent specification describes the software as fully implementing the printing and scanning functionality (*i.e.*, providing all of the necessary instructions), or that the Examiner specifically called out the functionality of this software as key to patentability.  *See* Def. Br. at 35 (citing Def. Ex. 1 at 8:14-26 & Def. Ex. 40 at Infinity0001827).  Nor does Infinity deny that it described the exclusive use of "generic" software to accomplish the tasks of printing and scanning as critical to the claimed invention.  *Id*. at 36 (citing Def. Ex. 45 at 9).

Importantly, Infinity does not deny that it took the position that the Patents-in-Suit require that *only* non-customized software be used, and distinguished the *Kochis* and *Yokota* prior art references on the ground that each used some customized software in the printing and scanning processes.  *Id*. at 36 (citing Def. Ex. 16 at 25, 27-29 & 40, Def. Ex. 15 at 18, Def. Ex. 45 at 9).  "[E]xplicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim."  *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998); *see also Omega Eng'g*, 334 F.3d at 1324 ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the

scope of the surrender.").

Instead, Infinity recites the legal truism that terms are to be construed in the context of the claims—which is exactly how Defendants have construed this term. Rhetoric aside, Infinity does not identify any supposed discrepancy between Defendants' construction and the intrinsic evidence. Infinity also asserts without explanation that Defendants' construction is insufficiently supported by the intrinsic record. But as shown above, Defendants' proposed construction is drawn directly from the intrinsic evidence, including the specification, the Examiner's statements, and Infinity's own statements to the USPTO. Def. Br. at 35-37.

### 3. Infinity's Proposed Construction Ignores Its Own Statements to the USPTO

Despite a years-long dialogue with the USPTO about what "generic send/receive driver communications software" means, Infinity's stated position is that this term need not be construed. Both Infinity and its expert make the conclusory argument that the "phrase would [] be readily understood by a person of ordinary skill in the art." Resp. at 23; Levitt Decl. at ¶ 72. This is entirely at odds with the prosecution history.

Notably, Infinity gives several supposed examples of "generic send/receive driver communications software" that would fall within the claims—"WIA/STI, TWAIN and the PCL printer driver"—none of which are referenced in the specification. *See* Resp. at 23. And even more importantly, Infinity told the USPTO exactly the opposite when it distinguished the *Kochis* prior art reference on the basis that "PCL . . . driver software" was not "generic send/receive driver communications software."

> The Patent Owner notes that Kochis 762's SCL, PCL and FCL driver software is specific software that is not a member of "a group or class of send/receive driver communications software capable of interfacing with standard/conventional facsimile machine using standard communication protocols on a standard PC," (i.e. not "generic send/receive driver communications software"). They are application specific, proprietary *command language routines* created using a PC's command language utility. In accordance with the teaching of

Def. Ex. 38 at 10; *see also* Def. Ex. 16 at 49 ("Kochis' SCL, PCL and FCL driver software we assert are 'customized or tailored' as they are specific to a utility command language specific to the computer. . . . Subsequently we would not qualify these as 'general-purpose' or 'any available send/receive communication software Package,' and hence not 'generic.'"). Infinity could not be clearer in its efforts to read the Patents-in-Suit one way to obtain their issuance from the USPTO, and an entirely different way when seeking damages. Such tactics should not be permitted.

Furthermore, Infinity's alternative construction is wrong and should be rejected for the following reasons.

First, Infinity's construction ignores its own statements to the USPTO defining "generic" and "send/receive driver communications software." Those statements are controlling for all the reasons discussed above. *See also* Def. Br. at 31-37.

Second, even if Infinity were not bound by its own statements—and it is—Infinity's construction cannot be reconciled even with the portions of the prosecution history that it selectively cites. Infinity's construction is not one that was ever adopted during either the original prosecution or any reexamination. Rather, Infinity's construction is based ***in part*** on the Examiner's interpretation of "generic send/receive driver communications software" in the second of three separate rounds of reexamination—***but only in part***. As discussed in the Decision Granting *Ex Parte* Reexamination that Infinity quotes, the Examiner in the second round of reexamination

"adopted the following interpretation for this feature: a group or class of send/receive driver communications software capable of interfacing with a standard/conventional facsimile machine using standard communication protocols on a standard PC."  Def. Ex. 21 (also Pl. Ex. 8) at 15 (emphasis omitted).  But that is not Infinity's proposed construction; Infinity inexplicably proposes to delete "a group or class of send/receive" (highlighted below) from the Examiner's description.

> The Examiner in the '816 reexamination found claims 1-6 and 18-20 of the '811 patent patentable based upon a new interpretation of the claimed *generic* send/receive driver communications software, as argued by the Patent Owner in response to the final rejection, and supported by the first Levitt Declaration (see response filed 30 December 2013, pages 7-17).  In allowing claims 1-6 and 18-20, the Examiner adopted the following interpretation for this feature: a group or class of send/receive driver communications software capable of interfacing with a standard/conventional facsimile machine using standard communication protocols on a standard PC.

*Id*. (highlighted).

By eliminating this aspect of the Examiner's interpretation, Infinity would read out express limitations and thereby dramatically rewrite and broaden the claims.  The Examiner's reference to "a group or class" is intended to reflect the "generic" requirement.  *See, e.g.*, Pl. Ex. 7 at 298 (definition of "generic" referenced by Examiner).  Infinity was able to save 13 of 14 independent claims from being invalidated only by amending them to require "generic" send/receive driver communications software.  *See* Def. Br. at 13; Pl. Exs. 9 & 10.  There are hundreds of pages of prosecution history that address the "generic" limitation, but Infinity's construction would erroneously read it out of the claims.

Infinity also proposes to eliminate, without explanation, the requirement that the claimed software be "send/receive" driver communications software.  Not only is this contrary to the most basic tenets of claim construction, but it defies common sense.  Rather than defining the term

"generic send/receive driver communication software," Infinity's construction would effectively rewrite the claim language to merely "driver communication software."  This is impermissible. *See, e.g.*, *Enzo Biochem Inc. v. Applera Corp.*, 780 F.3d 1149, 1154 (Fed. Cir. 2015) (overturning district court claim construction that read out express limitations of the claim); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("all claim terms are presumed to have meaning in a claim").

Finally, Infinity's construction would eliminate the "standard/conventional" modifier that precedes "facsimile machine."  This is simply one more instance in which Infinity's answer to the intrinsic evidence is to attempt to ignore it.

Infinity's construction should be rejected.

### D.     "Using an Unmodified Standard Protocol for Shifting the Personal Computer to a Connected Mode"

| Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "using an unmodified standard protocol for shifting the personal computer to a connected mode"<br><br>'811, cl. 7 | "using a set of instructions, each of which is unmodified and described in a facsimile standard promulgated by the CCITT/ITU-T, to establish a communication link between the personal computer and the facsimile machine" | No construction necessary<br><br>A person of skill in the art would not understand shifting the personal computer to a connected mode to be limited to a specific standard. |

Infinity does not dispute that the phrase "using an unmodified standard protocol for shifting the personal computer to a connected mode" was not in the claims of the '811 patent until *after* it issued, or that the term "unmodified" does not appear in the specification and was discussed for the first time during reexamination.  *See* Def. Br. at 37-40 (citing Def. Ex. 1 at 4:58-64, 5:17-20, 5:47-51; Def. Ex. 1 at C1 at 2:14-15; Def. Ex. 15 at 8-10; Def. Ex. 16 at 8, 25; Def. Ex. 38 at 5,

14, 15; Def. Ex. 51 at 4, 8-9; Def. Ex. 52 at 30-31; Def. Ex. 53 at 8, 9, 11; Def. Ex. 54 at ¶¶ 19,

23-26.).   Yet, Infinity fails to acknowledge, much less address, any of the reexamination

proceedings, which are the only portions of the intrinsic record to which a person of ordinary skill

in the art would turn to understand the phrase.

Instead, Infinity argues at considerable length that Defendants' proposed construction is

wrong because it defines a protocol as "instructions" rather than "rules." Resp. at 25-26.  Infinity's

problem with "instructions" is difficult to understand since it proposed "using a standard set of

**instructions** that are supported by the facsimile machine" in the Joint Claim Construction and

Prehearing Statement for the "standard protocol" term in the '915 patent.  Dkt. No. 108 at 19

(emphasis added); *see* section II.G, *infra* (Infinity's proposed construction changed from "set of

instructions" to "set of rules").  Setting aside Infinity's unexplained change in position, Infinity

does not explain how "rules" are materially different from "instructions."  Defendants believe there

is no difference in this context, and thus would accept either "rules" or "instructions" as part of a

proper construction.

Infinity next argues that it is improper to require that the claimed standard protocol be "a

facsimile standard promulgated by the CCITT/ITU-T."  Resp. at 26.  Infinity is wrong because it

fails to account for the extensive intrinsic record.  *See* Def. Br. at 38-39.  Infinity repeatedly defined

"standard protocol" as a CCITT fax protocol during reexamination.  *See, e.g.*, Def. Ex. 16 at 8

("'standard protocol' (i.e., CCITT Fax protocol)"), 25 ("standard protocols (CCITT Fax

protocols)"); Def. Ex. 15 at 9 ("use of CCITT Group 1, 2, 3 standard protocol (an 'unmodified

standard protocol')"); Def. Ex. 38 at 14, 15 ("an unmodified standard protocol - the CCITT FAX

protocol").   Despite Infinity's repeated representations during reexamination that a standard

protocol *is* a CCITT Fax protocol, Infinity now inexplicably argues that "[a] person of skill in the

art would not understand shifting the personal computer to a connected mode to be limited to a specific standard." Resp. at 25. Likewise, Infinity overcame prior art rejections during reexamination because both the examiner and Infinity agreed that "unmodified" required that there be no deviation in that protocol. *See, e.g.*, Def. Ex. 15 at 8-10; Def. Ex. 38 at 5; Def. Ex. 53 at 8-11. "[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover . . . claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Spectrum*, 164 F.3d at 1378-79 (citations and internal quotation marks omitted).

Infinity then argues that "[t]he patent also discloses other protocols for shifting a personal computer to a connected mode, including RS232." Resp. at 26. Infinity's argument improperly conflates the method of connection (*i.e.*, an RS232 cable) with the protocol used to transmit data. Infinity cites the specification's references to RS232, but these passages relate only to the use of an RS232 cable to physically connect the PC and fax machine. They do not describe how to "shift[] the personal computer to a connected mode." *See* Def. Ex. 1 at 6:38-40 ("the PC-type computer 40 is **coupled** to external facsimile modem circuity 41, for example, **through an RS232 cable**" (emphasis added)); 6:51-54 ("PC-type computer 40 is **coupled** to the facsimile modem circuitry 41 and interface circuit 10 **through an RS-232 cable**" (emphasis added)); 8:7-13 ("they are converted into a digital serial signal and then **transmitted through the RS232 sending interconnect port**, the signal is then **received by an RS232 connector** at the PC" (emphasis added)); claim 8 ("using **RS 232 connector ports to interface between** the facsimile machine and the personal computer" (emphasis added)). Contrary to Infinity's assertions, the intrinsic evidence makes clear that "shifting the personal computer to a connected mode" relates to the protocol used to transmit data, not the port used. Def. Ex. 1 at 4:58-64 (the PC "shifts to a receive mode for

receiving what appears to the PC to be a facsimile transmission from a 'remote' facsimile machine"); Def. Ex. 51 at 8 ("In other words, the unmodified standard protocol is 'used for shifting' in the sense that data signals to be transmitted or received by the computer are converted to, or otherwise made to conform to, the standard fax protocol upon preparing the computer for image data transmissions to and from a fax machine").

Infinity finally makes an unsupported and nonsensical assertion about "connected mode," Resp. at 27, but claim construction requires evidence, and Infinity cites none. *Cf. Phillips*, 415 F.3d at 1314-19 (discussing evidence relevant to construction and evidentiary hierarchy). Furthermore, in keeping with its pattern throughout its Responsive Brief, Infinity fails to address, much less distinguish, Defendants' cited intrinsic evidence regarding the meaning of "for shifting the personal computer to a connected mode." *See* Def. Br. at 39-40. Defendants' proposed construction of the term, as informed by the extensive intrinsic record, should be adopted by the Court.

### E.    The "Isolating" Terms

| Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "by-passing or isolating the facsimile machine and the computer from the public network telephone line" / "both the facsimile machine and [personal] computer isolated from said at least one public network telephone line"<br><br>'811, cl. 1, 6, 7, 20 | "disconnecting the facsimile machine and the computer from the public telephone network" / "the facsimile machine and the computer having been disconnected from the public telephone network" | No construction necessary<br><br>or<br><br>"the data flow of the scan or print data circumvents the public network telephone line <s>by passing or isolating the data flow of the scan data from the public network telephone line</s>" |

Defendants' construction of these related terms is supported by the intrinsic record and mid-1990s technical dictionary definitions of "isolate[d]." Def. Br. at 40-42. Infinity does not address the evidence cited in Defendants' Opening Brief. Nor does Infinity dispute that the results

described in the claims of the '811 patent would have been unobtainable unless both the facsimile machine and the computer were disconnected from the public telephone network.  *Id*. at 42 (citing Randolph Dec. at ¶ 73).

Infinity instead offers a new construction (proffered for the first time after Defendants filed their Opening Brief), but does not cite to any intrinsic or even extrinsic evidence in support. Instead, Infinity relies entirely on two cases in which "bypass" and "isolating" were construed in the context of patents unrelated to the Patents-in-Suit.  Resp. at 28-29.  As an initial matter, the construction of a claim term in an unrelated patent is of marginal relevance because the specifications and prosecution histories are different and claim terms are construed in light of this intrinsic evidence.  *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1211 (Fed. Cir. 2002) (holding that claim scope in an unrelated patent "sheds no light on" scope of terms being construed).

Moreover, to the extent that the court's construction in *SynQor, Inc. v. Artesyn Techs., Inc.*, No. 2:07-CV-497, 2010 WL 2991037 (E.D. Tex. July 26, 2010) has any relevance, it supports Defendants' position, not Infinity's.  The *SynQor* court construed "isolation" and "isolating" as "the absence of an electric path permitting the flow of DC current (other than a *de minimis* amount) between an input and an output of a particular stage, component, or circuit."  *Id*. at *7.  Defendants' proposed construction, which makes clear that "disconnecting" is required, is consistent with the "absence of an electrical path" between the facsimile machine or the computer on the one hand and the public telephone network on the other.  Infinity's proposed construction, by contrast, does not require disconnection or the absence of such an electrical path; it merely provides that the path go unused.  In this way, Infinity's construction would impermissible broaden the claims by effectively reading out "by-passing" and "isolating."

F.      The "Facsimile Signals" Terms

| Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "facsimile signals" / "a facsimile machine signal" / "digital facsimile signals of the scanned document" / "scanned image signals from the facsimile machine" / "transmitted facsimile signals" / "facsimile machine communications signals" | "signals that transmit data that are encoded in accordance with a facsimile standard promulgated by the CCITT/ITU-T" | No construction necessary. |
| "facsimile format" / "a standard facsimile machine format" | "a format that is described by a facsimile standard promulgated by the CCITT/ITU-T" | |
| "scanned facsimile machine image data"<br><br>'811, cl. 1, 6, 7, 18<br>'423, cl. 2<br>'915, cl. 1, 9 | "data that are encoded in accordance with a facsimile standard promulgated by the CCITT/ITU-T" | |

As noted in Defendants' Opening Brief, Infinity's infringement theories depend broadening the claims to capture signals, formats, and image data that have nothing to do with facsimile technology.  Infinity's proposed non-construction of these related terms appears intended to read out of the requirement that the claimed signals, format, and image data be those of a facsimile machine, as opposed to those of, for example, a computer or printer.  The argument that facsimile signals "are signals of a facsimile machine," Resp. at 29, is true only so long as "facsimile machine" is properly construed, as Defendants propose.

As explained above, Infinity proposes that "facsimile machine" be considered the entirety of any device that is capable of sending a fax, despite Infinity's numerous disclaimers and disavowals during the reexaminations of the Patents-in-Suit.  There is no support for Infinity's approach in the intrinsic or extrinsic record as explained at length in section II.A, *supra*.  Indeed,

the relevant evidence supports a construction that associates "facsimile" with a facsimile standard promulgated by the CCITT/ITU-T, as noted in Defendants' Opening Brief.  Def. Br. at 43.

Infinity's criticisms of Defendants' proposed construction miss the mark.  First, Infinity suggests that Defendants' proposed construction "would require transmission ('transmit data') when several of the terms that Defendants lump into this category have no such requirement." Resp. at 29.  But Infinity has not identified the "several terms," and to the extent that it is referring to the "facsimile format" and "facsimile . . . data" terms, these are construed separately, as clearly set forth in Defendants' Opening Brief.

Second, Infinity complains that Defendants' proposed construction "require[s] a specific signal encoding, namely 'a facsimile standard promulgated by the CCITT/ITU-T," and that this requirement is not in the claims.  Resp. at 29-30.  Infinity is mistaken.  As noted in Defendants' Opening Brief, one of ordinary skill in the art would understand that "facsimile" invokes the CCITT/ITU-T facsimile standards.  Def. Br. at 43; Randolph Dec. at ¶ 66.  Infinity does not dispute the evidence that Defendants cite, including the prosecution history in which Infinity stated that the invention employs an existing internal or external fax modem on the computer side of the system. *See* Def. Ex. 56 at 10 ("The Applicant takes a much simpler approach and does not provide a fax modem, but uses the existing fax modem in the computer or externally connected to the computer to send or receive a scanning or printing data transmission, as shown in Applicants Figures 2E, 2I, and 2J.").  Instead, Infinity presents a muddled discussion of "generic communications" that provides no logical support for Infinity's position that the "facsimile signals" terms should not be construed.  *See* Resp. at 30.

### G.     "Using a Standard Protocol of the Facsimile Machine"

| Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "using a standard protocol of the facsimile machine"<br><br>'915, cl. 1 & 9 | "using a set of instructions that are described by a facsimile standard promulgated by the CCITT/ITU-T" | No construction necessary<br><br>or<br><br>"using a standard set of ~~instructions~~ <u>rules</u> that are supported by the facsimile machine" |

As with "using an unmodified standard protocol for shifting the personal computer to a connected mode," Infinity's discussion of this term focuses almost entirely on the irrelevant question of whether a "protocol" is more properly described as a set of "instructions" or "rules." *See* section II.D, *supra*.  Infinity's argument that a "protocol" is a set of "rules" is new.  In the Joint Claim Construction Chart, Infinity proposed that this term be construed as "using a standard ***set of instructions*** that are supported by the facsimile machine."  Dkt. 108 at 19 (emphasis added). In any event, there is no relevant distinction between "rules" and "instructions" in this context.  A protocol certainly could be viewed as a set of rules, setting forth how devices are to behave under various conditions.  But it can also be viewed as a set of orders that the devices must obey, *i.e.*, instructions.  Defendants are not aware of any material difference for purposes of these claims, and Infinity identifies none.  Defendants suggest that either term can be used.

Infinity has little to say about the central issue in dispute: whether the protocols must be described by a facsimile standard promulgated by the CCITT/ITU-T.  Infinity admits that a facsimile standard promulgated by the CCITT/ITU-T is a "standard protocol of the facsimile machine."  Resp. at 32.  But Infinity also suggests, without explanation, that to equate the two would be to impermissibly read in limitations from the specification.  But equating them is exactly what Infinity did during the prosecution of the '915 patent.  *See, e.g.*, Def. Ex. 66 at 8 ("[*Kochis '458*] does use a 'standard protocol' (i.e., CCITT Fax protocol). . . .") & 25 ("Kochis and Yokota

both utilize standard protocols (CCITT Fax protocols).”); Def. Ex. 58 at 9 (“Kurosaki’s use of

CCITT Group 1, 2, 3 standard protocol (an ‘unmodified standard protocol’). . .”); *see also Chimie*,

402 F.3d at 1384 (holding that claims cannot be “construed one way in order to obtain their

allowance and in a different way against accused infringers.”).  Infinity does not address, much

less distinguish, this significant evidence.

Under Infinity’s construction, the “standard protocol of the facsimile machine” need not

have anything to do with facsimile technology at all, and instead is merely something “supported

by” the “facsimile machine”—which, as discussed above, Infinity would erroneously construe as

any device capable of sending or receiving a fax, regardless of its other functionality.  *See* section

II.A, *supra*.  This reading would effectively eliminate the word “facsimile” from the term, in direct

contravention of Federal Circuit precedent.  *See, e.g.*, *Becton, Dickinson & Co. v. Tyco Healthcare*

*Grp., LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (“Claims must be interpreted with an eye toward

giving effect to all terms in the claim.”) (internal quotations omitted).

### H.    The “Digital Signals” Terms

| Term/Phrase | Defendants’ Construction | Plaintiff’s Construction |
|---|---|---|
| “digital signals” / “digital … signal(s)”<br><br>’811, cl. 1, 7, 19, 20<br>’423, cl. 1, 2,<br>’574, cl. 1, 8 | “signals that carry data in the form of digits or interval quantities, and not in analog form” | No construction necessary<br><br>or<br><br>“binary <u>data</u> signals <u>which are signals comprising a sequence of voltages, wherein the voltages represent discrete values of digital data, most typically 1s and 0s of a binary number”</u> |

Infinity’s construction—proposed for the first time after Defendants filed their Opening

Brief—ignores Infinity’s express statements made during the prosecution of the Patents-in-Suit,

as well as industry definitions.  Instead, Infinity points to a single statement by the Examiner, not

Infinity, purporting to support Infinity's newly minted construction.  It does not support that construction.  In fact, in the very document upon which Infinity relies, the Examiner stated

> Nonetheless, the examiner points out that ***the patent owner is bound by the arguments made in prosecution***.  It does not matter whether an argument was persuasive or adopted for allowance; it matters only that the argument was made. *See Greenliant Systems, Inc. v. Xicor LLC,* 692 F.3d 1261, 103 USPQ2d 1951 (Fed. Cir. 2012).

Pl. Ex. 9 at 11 (emphasis added); *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("We have stated on numerous occasions that a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation.").

Infinity made clear during prosecution: (1) the cited prior art device was different from the alleged invention because the prior art device "accepts standard analog transmission signals ***not digital signals***" (Def. Ex. 61 at 12 (emphasis added)); and (2) in the alleged invention "the data is always 'digital' data" (Def. Ex. 63 at 2).  Thus—contrary to Infinity's argument now—Infinity's express prosecution statements require that ***both*** the underlying data and the signals themselves be digital, and not analog.

In short, Infinity is seeking a construction that conflicts with the express statements Infinity made during prosecution.  In contrast, Defendants' proposed construction properly accounts for, and relies upon, those statements, along with industry definitions.

### I.        The "Bidirectional" Terms

| Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "bi-directional" / "bidirectional"<br><br>'811, cl. 1, 2, 6, 7, 18-20<br>'423, cl. 1, 2, 6<br>'574, cl. 1, 7, 8<br>'915, cl. 1, 9 | "a pathway that provides for data to flow in two directions between a computer and a facsimile machine to support transmission of scanning and printing signals over the same cable" | No construction necessary |

While Defendants cited evidence from *both* the original prosecution history *and* reexaminations establishing prosecution history disclaimer for the "bi-directional" term, *see* Def. Br. at 47-49, Infinity addresses *only* the original prosecution before summarily concluding that disclaimer does not apply, *see* Resp. at 35-36.   During reexamination, Infinity specifically disclaimed a broader interpretation of the "bi-directional" term that merely "enabled" bi-directional transmission of scanning and printing signals over the same cable to avoid the *Kurosaki* reference.  Infinity argued that the reference did not teach the claimed "bi-directional" connection because in Kurosaki the "*use* of RS 232 is not 'bi-directional'" even though RS 232 is a connector capable of bi-directional communications.  Def. Ex. 31 at Infinity0008779.  This disclaimer was clear, unmistakable, and not subject to varying interpretations.   This meets the standard for prosecution history disclaimer—and Infinity has not attempted to argue otherwise.

In arguing "no construction [is] necessary," Infinity now apparently seeks to recapture scope it disclaimed in order to survive reexamination.   The doctrine of prosecution history disclaimer exists to preclude this kind of doublespeak.   "[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover. . . . claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."  *Spectrum*, 164 F.3d at 1378-79 (citations and internal quotation marks omitted).

Infinity's discussion of the original prosecution and the *Simon* reference is incorrect, as the record excerpted by Infinity shows.  In particular, *Simon* did not provide only analog print signal transfers.  *Simon* "shows a <u>print only</u> capability between a PC and a FAX using parallel port connections, and a <u>scanner only</u> capability between a fax and a PC using an RS 232 serial connection."  Resp. at 36 (quoting Def. Ex. 36 at 14-15) (emphasis in original).  That is, *Simon* taught bi-directional communication, just not using the same connection; in contrast, the applicant

argued that its claimed invention taught sending both scanning and printing signals "over the same connection," a "single a [*sic*] RS 232, or parallel cable connector." *Id.* Thus the original prosecution history also gives rise to a disclaimer that dictates Defendants' construction.

The rest of Infinity's arguments are non-responsive or unpersuasive. Infinity misses the point when it contends that "[n]othing about the term 'bi-directional' itself requires transmission of particular types of data." Resp. at 34. Defendants' proposed construction is based on Infinity's characterization of the "bi-directional" limitation in the prosecution history, not the meaning of the term "bi-directional" in the abstract, divorced from the intrinsic record. Likewise, Infinity invokes claim differentiation (*id.* at 35), but that doctrine creates merely a rebuttable presumption. If, as here, the applicant's arguments narrowing the scope a claim term meet the standard for prosecution history disclaimer, then the claim differentiation presumption is rebutted. *See Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368-75 (Fed. Cir. 2005). Finally, Dr. Levitt's testimony is irrelevant because he admits that he did not consider the prosecution histories or reexaminations in rendering his opinion on the "bi-directional" terms. Def. Ex. 72 at 215:10-217:3.

### J.  Indefinite Step-Plus-Function Claim Terms

#### 1.  The "activating," "conditioning," and "arranging" Limitations Are Step-Plus-Function Claim Terms Subject to 35 U.S.C. § 112, ¶ 6

Infinity's discussion of the step-plus-function terms is based on a fundamental misunderstanding of 35 U.S.C. § 112, ¶ 6. Resp. at 37-44. Prior to the Federal Circuit's decision in *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015), if a claim element did not recite the words "means" or "step," there was a strong presumption that it was not a means-plus-function or step-plus-function limitation subject to the special claim construction rules of § 112, ¶ 6. In *Williamson*, however, the Federal Circuit expressly overruled the characterization of the

presumption as "strong," and recognized that "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words" could be the functional equivalent of "means." *Id.* at 1349 & 1350.

A "nonce" word is not, as Infinity seems to suggest, a word that one of ordinary skill in the art would not understand. *See* Resp. at 40, 42, 43. Rather, a "nonce" word is one that "reflects a verbal construct[]" that "may be used in a claim in a manner that is tantamount to using the word 'means.'"[15] *Williamson*, 792 F.3d at 1350. Thus, it is no answer to say that one of ordinary skill in the art would understand that "activating," "conditioning," and "arranging" have *some* meaning. The issue is whether one of ordinary skill would understand these terms in the context of these claims to connote *specific actions*. As Defendants have shown, they would not. Def. Br. at 52-58; Randolph Decl. ¶¶ 120, 133, 146, 169, 182, 195.

Infinity makes no effort to analyze the claim language, or to show that the "activating" "conditioning," and "arranging" limitations refer to specific acts. Instead, Infinity suggests that "activating," "conditioning," and "arranging" are not *always* subject to § 112, ¶ 6.[16] But it does

---

[15] The claim element at issue in *Williamson* was "distributed learning control module," which was found to invoke the "means" aspect of § 112, ¶ 6. As Infinity recognized in its claim construction brief, "the step-plus function language of 35 U.S.C. Section 112, paragraph 6 applies here [and] [t]he Federal Circuit has not differentiated treatment between 'step' and 'means' in this context." Resp. at 10, n.1.

[16] For example, Infinity cites three cases in which "activating" or variations thereof have been construed. *See* Resp. at 40-41 (citing *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), *Callpod, Inc. v. GN Netcom, Inc.* 2009 U.S. Dist. LEXIS 51103 (N.D. Ill. Mar. 6, 2009), *Bed-Check Corp. v. Ultimate Safety, Inc.*, 2003 U.S. Dist. LEXIS 27845 (N.D. Okla. Nov. 24, 2003)). However, the issue of whether "activating" was a step-plus-function term appears not to have been in dispute—and even if it had been at issue, it is irrelevant that different claims might recite both the word "activating" and the relevant structures, materials or acts such that the claim is subject to the normal rules of claim construction, and not § 112, ¶ 6. Similarly, *In re Schreiber*, 128 F.3d 1473 (Fed. Cir. 1997), *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999), and *Innova/Pure Water* do not address § 112, ¶ 6 at all. *See* Resp. at 37-38. In that case, the patent claims described the structure of a device, in part, by what it did. That is not the issue here, where the acts to be performed are not identified by the functions recited in the claims.

not follow that these terms are *never* subject to § 112, ¶ 6. Paragraph 6 of § 112 is invoked where, as here, a patentee recites "a means or step for performing a specified function *without* the recital of structure, material or acts in support thereof[.]" 35 U.S.C. § 112, ¶ 6 (emphasis added). The testimony of Infinity's own expert confirms that the "activating," "conditioning," and "arranging" terms are a linguistic black box; *some act* must be done to perform the function, but the claim language does not identify what that act might be.

For example, after declaring that "activating" means "starting or putting in an active state," Dr. Levitt testified that the function of starting or putting in an active state cannot be accomplished without performing an "activating" step. Def. Ex. 72 at 180:22-181:3. In other words, "activating" does not connote any particular action. Dr. Levitt provided similar testimony with respect to the "conditioning" and "arranging" steps. Def. Ex. 72 at 181:16-19, 182:2-6, 182:17-22. Infinity is attempting to claim every act to achieve the function of the "activating," "conditioning," and "arranging" steps—precisely what § 112, ¶ 6 does not permit. *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) (noting that requirements of § 112, ¶ 6 are meant to address unbounded functional claiming).

### 2. Infinity Has Made No Effort to Show that, If These Terms Are Subject to 35 U.S.C. § 112, ¶ 6, They Meet the Definiteness Requirement

Infinity does not seriously argue that the specifications of the Patents-in-Suit disclose specific actions for achieving the claimed "activating," "conditioning," and "arranging" functions. Instead, Infinity asks that if the Court were to find these terms subject to § 112, ¶ 6, then Infinity should be allowed to submit additional briefing about any corresponding disclosure of the specification. Resp. at 39.[17] That request should be denied.

---

[17] Infinity incorrectly indicates that it would brief "the corresponding structure in the specification." Resp. at 39. If Infinity asserted apparatus claims for a particular device, the issue would be what corresponding structure is disclosed in the specification. Because Infinity asserts

Infinity has been aware of Defendants' position since June 15, 2018, when Defendants' served their Preliminary Proposed Claim Constructions, and identified these terms as both subject to § 112, ¶ 6 and indefinite because the specification does not disclose actions sufficient to achieve the claimed function.  For terms subject to § 112, ¶ 6, the identification of corresponding structure, material, or acts is a required part of the claim construction process.  *Asyst Tech., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1373 (Fed. Cir. 2001) (district court has a duty to identify "structures" in the specification corresponding to the "means" in the claim term for carrying out the function as recited); 35 U.S.C. § 112, ¶ 6 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim *shall be construed* to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.") (emphasis added).  In the instant case, this Court has the duty to identify the "actions" in the specification corresponding to the "steps" in the claim term for carrying out the function as recited.  Since no such actions are recited in the specification, the claims are indefinite and invalid.  Infinity's decision not to fully address the correct construction of these terms does not justify another round of briefing, or require the Court to issue multiple claim construction orders.  Infinity has had full opportunity to address Defendants' contentions.

In fact, Infinity was able to evaluate the issues enough to claim that Mr. Randolph's declaration includes "oversights and misunderstandings," Resp. at 39, albeit ones that Infinity does not address at all in its Opposition.  However, as became clear during Dr. Levitt's deposition, Mr. Randolph fully understood the disclosure in the Patents-in-Suit, and identified numerous problems in attempting to carry out the claimed invention based on the teachings of that disclosure.  That

---

only method claims, the issue here is whether the specification discloses *actions* (not structures) that correspond to the functional steps recited in the claims.

the Patents-in-Suit fail to teach the actions needed to accomplish the functions claimed is not reasonably in dispute.

## III.     CONCLUSION

For the foregoing reasons and the reasons set for in their Opening Claim Construction Brief, Defendants respectfully request that the Court adopt their proposed claim constructions or hold the asserted claims invalid.

DATED: October 26, 2018

Respectfully submitted,

*/s/ John V. Gorman*
John V. Gorman, Esq.
Amy M. Dudash, Esq.
MORGAN LEWIS & BOCKIUS
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215-963-5000
Email: john.gorman@morganlewis.com
Email: amy.dudash@morganlewis.com

Susan Baker Manning, Esq. (pro hac vice)
Jacob A. Snodgrass, Esq. (pro hac vice)
MORGAN LEWIS & BOCKIUS
1111 Pennsylvania Ave NW
Washington, DC 20004
Telephone: 202-739-5836
Email: susan.manning@morganlewis.com
Email: jacob.snodgrass@morganlewis.com

*Counsel for Defendant HP Inc.*
*in Case No. 12-6805*

*/s/ Paul T. Meiklejohn*
Paul T. Meiklejohn, Esq.
Erin C. Kolter, Esq.
DORSEY & WHITNEY LLP
701 Fifth Ave, Suite 6100
Seattle, WA 98104
Telephone: 206-903-8800

Email: meiklejohn.paul@dorsey.com
Email: kolter.erin@dorsey.com

*/s/ Xin-Yi Zhou*
Mark A. Samuels, Esq.
Ryan K. Yagura, Esq.
Xin-Yi Zhou, Esq.
O'MELVENY & MYERS LLP
400 S. Hope St.
Los Angeles, CA 90071
Telephone: 213-430-6100
Email: msamuels@omm.com
Email: ryagura@omm.com
Email: vzhou@omm.com

Gary Allen Rosen, Esq.
LAW OFFICES OF GARY A ROSEN, PC
63 W Lancaster Ave. Suite 1
Ardmore, PA 19003-1413
Email: grosen@logarpc.com

*Counsel for Defendant,*
*Samsung Electronics America, Inc.*
*in Case No. 12-6798*

*/s/ Timothy Vann Pearce, Jr.*
Alex R. Sluzas, Esq.
PAUL & PAUL
Three Logan Square
1717 Arch St. Suite 3740
Philadelphia, PA 19103
Telephone: 215-568-4900
Fax: 215-567-5057
Email: ars@paulandpaul.com

Sten A. Jensen, Esq.

Nancy J. Gellman, Esq.
CONRAD O'BRIEN
1500 Market St, Suite 3900W
Philadelphia, PA 19102-2100
Telephone: 215-864-9600
Fax: 215-864-9620
Email: ngellman@cogr.com

*Counsel for Defendant,*
*Toshiba America Business Solutions, Inc.*
*in Case No. 12-6796*

Steven J. Routh, Esq.
Timothy Vann Pearce, Jr., Esq.
ORRICK HERRINGTON & SUTCLIFFE LLP
1152- 15th St. NW
Washington, DC 20005
Telephone: 202-339-8400
Fax: 202-339-8500
Email: sjensen@orrick.com
Email: srouth@orrick.com
 Email: vpearce@orrick.com

 *Counsel for Defendant,*
 *Konica Minolta Business Solutions, U.S.A., Inc.*
 *in Case No. 12-6802*

*/s/ Michael V. Solomita*
Evan Lechtman, Esq.
BLANK ROME
One Logan Square
PHILADELPHIA, PA 19103
Telephone: 215-569-5367
Fax: 215-832-5367
Email: lechtman@blankrome.com

Michael V. Solomita, Esq.
NORTON ROSE FULBRIGHT US LLP
1301 Avenue Of The Americas
New York, NY 10019
Telephone: 212-408-5420
Email:
michael.solomita@nortonrosefulbright.com

*Counsel for Defendant Ricoh USA, Inc.*
*in Case No. 12-6807*

*/s/ David A. Simons*
Benjamin D. Hartwell, Esq.
WARD GREENBERG HELLER & REIDY LLP
1835 Market St Suite 650
Philadelphia, PA 19103
Telephone: 215-836-1100
Email: bhartwell@wardgreenberg.com

Eric J. Ward, Esq.
WARD GREENBERG HELLER & REIDY LLP
1800 Bausch & Lomb Place
P.O. Box 1051
Rochester, NY 14604
Telephone: 585-454-0714
Email: eward@wardgreenberg.com

David A. Simons
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone: 617-261-3258
Email: david.simons@klgates.com

Ranjini Acharya
K&L GATES LLP
620 Hansen Way
Palo Alto, CA 94304
Telephone: 650-798-6765
Email: ranjini.acharya@klgates.com

*Counsel for Defendant Xerox Corporation*
*in Case No. 12-6804*

_/s/ Matthew S. Yungwirth_
Louis Norwood Jameson, Esq.
Matthew S. Yungwirth, Esq.
DUANE MORRIS LLP
1075 Peachtree St. NE, Suite 2000
Atlanta, GA 30309
Telephone: 404-253-6900
Email: wjameson@duanemorris.com
Email: msyungwirth@duanemorris.com

Joseph A. Powers, Esq.
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
Telephone: 215-979-1842
Email: japowers@duanemorris.com

_Counsel for Defendant Dell, Inc._
_in Case No. 12-6808_

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed on this 26th day of October, 2018, using the electronic case filing (CM/ECF) for the U.S. District Court for the Eastern District of Pennsylvania, which will send notification of such filing to all counsel of record.

*/s/Jacob A. Snodgrass*
Jacob A. Snodgrass